### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DAVID R. FIGARD, and | ) | Case No. 06-70268-JAD |
| REBECCA J. FIGARD, | ) | |
| | ) | |
| Debtor. | ) | Chapter 13 |
| | ) | |
| _____ | X | |
| | ) | |
| DAVID R. FIGARD, and | ) | |
| REBECCA J. FIGARD, | ) | |
| | ) | |
| | ) | Adversary No. 06-07064-JAD |
| Plaintiffs, | ) | |
| | ) | Related To Document Nos. |
| vs. | ) | 144 and 145 |
| | ) | |
| PHH MORTGAGE CORPORATION | ) | |
| F/K/A CENDANT MORTGAGE | ) | |
| CORPORATION, D/B/A COLDWELL | ) | |
| BANKER MO., AND/OR ITS | ) | |
| SUCCESSORS OR ASSIGNS | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | X | |

Appearances:    Mary K. Wheeler, Esq., for the Debtors/Plaintiffs
John R. Canavan, Esq., for PHH Mortgage Corporation


## MEMORANDUM OPINION


This Memorandum Opinion constitutes the Court's findings of fact and

conclusions of law pursuant to Fed. R. Bankr. P. 7052.  The matter before the

Court is a Motion For Summary Judgment filed by PHH Mortgage Corporation,

f/k/a Cendant Mortgage Corporation, d/b/a Coldwell Banker MO., and/or its

successors or assigns ("PHH Mortgage" of "Defendant") with respect to various lender liability type claims asserted by David and Rebecca Figard (the "Figards" or the "Plaintiffs") against PHH Mortgage.  This matter is a non-core proceeding pursuant to 28 U.S.C. § 157(c)(1), and each of the parties has consented to the Court hearing and determining this matter on a final basis pursuant to 28 U.S.C. § 157(c)(2).

Pursuant to the Motion For Summary Judgment, PHH Mortgage asks that this Court grant the Defendant summary judgment and deny all of the lender liability claims asserted by the Figards.  For reasons set forth more fully in this Memorandum Opinion, the Court hereby grants the Motion for Summary Judgment in part, denies it in part, and finds as follows, to-wit:

## I.

The material facts of this case are generally not in dispute.  The underlying bankruptcy case was commenced by the Figards filing a voluntary petition under Chapter 13 of the United States Bankruptcy Code on April 25, 2006. (Bankruptcy Docket No. 1).[1]  On July 21, 2006, the Figards filed a complaint against PHH Mortgage giving rise to the instant adversary proceeding. (Docket No. 1).

In or around August/September 2004, the Figards decided to become first-time home buyers after having lived in rental property for approximately 10 years. (Docket No. 148, Exhibit A, R. Figard Dep. 15:8-9, June 8, 2007).  On or about

---

[1] For the remainder of the opinion, all citations to "Docket No." will reference the docket on Adversary No. 06-07064JAD unless otherwise specified.

September 23, 2004, the Figards entered into an Agreement of Sale for the purchase of a house located at 2321-23 16th Avenue, Altoona, Pennsylvania. (Id. Exhibit B).  The Agreement of Sale called for the purchase of the home for $60,000.00 with a down payment of $500.00, and was contingent upon the Figards obtaining a 30-year, conventional mortgage loan at an interest rate not to exceed 8%. (Id.).

On or before September 28, 2004, the Figards decided to contact PHH Mortgage to inquire about qualifying for a mortgage.  A representative of PHH spoke on the telephone with the Figards on September 28, 2004, and gathered information for their "Personal Profile & Loan Request," "Statement Of Assets And Liabilities," and the "Residential Loan Application." (Docket No. 148, Exhibits C, D, and E respectfully).  The Figards represented to PHH Mortgage that David Figard's monthly income was $3,300.00, and Rebecca Figard's monthly income was $1,516.67 for a total household monthly income of $4,816.67. (Docket No. 148, Exhibits C and E).  These documents, along with a "Federal And State Compliance Document" (Docket No. 148, Exhibit F) and "Request for Transcript of Tax Return" (Docket No. 148, Exhibit G), were sent to the Figards for their signatures. (Docket No. 147, ¶ 13).

The "Federal And State Compliance Document" included, *inter alia*, a "Good Faith Estimate of Settlement Costs," and an "Initial Truth-In-Lending Disclosure." Based upon information provided by the Figards over the phone to PHH Mortgage,

the "Good Faith Estimate of Settlement Costs" estimated that the total monthly

payment for the Figards would be $709.05.[2] (Docket No. 148, Exhibit F).  The

"Initial Truth-In-Lending Disclosure" indicated that the total amount financed

would be $58,143.56 with an annual percentage rate ("APR") of 11.70591%.[3] (Id.).

---

[2] This number arose from the aggregate of $435.05 for principal and interest, $209.00 for mortgage insurance, $41.00 for real estate taxes, and $24.00 for other insurance.

[3] The APR is defined in the Initial Truth-In-Lending Disclosure Statement as:

> the cost of your credit expressed in terms of an annual rate. Because you may be paying 'points' and other closing costs, the APR disclosed is often higher than the interest rate on your loan. The APR can be compared to other loans for which you may have applied and gives you a fair method of comparing price." (Docket No. 148, Exhibit F).  APR is defined in the exact same manner in the final Truth-In-Lending Disclosure Statement that was provided to the Figards at Closing. (*See* Docket No. 148, Exhibit R).

APR is defined by the Truth-In-Lending Act as:

> The annual percentage rate applicable to any extension of consumer credit shall be determined, in accordance with the regulations of the Board, (1) in the case of any extension of credit other than under an open end credit plan, as (A) that nominal annual percentage rate which will yield a sum equal to the amount of the finance charge when it is applied to the unpaid balances of the amount financed, calculated according to the actuarial method of allocating payments made on a debt between the amount financed and the amount of the finance charge, pursuant to which a payment is applied first to the accumulated finance charge and the balance is applied to the unpaid amount financed; or (B) the rate determined by any method prescribed by the Board as a method which materially simplifies computation while retaining reasonable accuracy as compared with the rate determined under subparagraph (A).

> (2) in the case of any extension of credit under an open end credit plan, as the quotient (expressed as a percentage) of the total finance charge for the period to which it relates divided by the amount upon which the finance charge for that period is based, multiplied by the number of such periods in a year.

15 U.S.C. § 1606(a).

This would yield a finance charge[4] of $124,660.06 for a total payment of $182,803.62 at the completion of all payments. (Id.).

PHH Mortgage generated a Fannie Mae Underwriting Findings report ("Underwriting Findings") using the information provided by the Figards and the Fannie Mae Desktop Underwriter software.[5] (Docket No. 148, Exhibit J). According to the Underwriting Findings, the Figards met Fannie Mae's eligibility requirements and were recommended for an Expanded Approval Risk Level III loan. (Id.).

Fannie Mae required a 35% minimum mortgage insurance coverage for all mortgages with a loan-to-value ratio[6] greater than 95%. (Docket No. 148, Exhibit K).  As the Figards were seeking to acquire a mortgage loan of $58,143.56 on property valued at $60,000.00, they had a loan-to-value ratio of approximately 97%.[7] Thus the Underwriting Findings required 35% minimum mortgage insurance coverage.

The Figards signed the documents that were sent to them by PHH and

---

[4] The finance charge is defined on the "Initial Truth-In-Lending Disclosure" as the cost of credit which is the sum of the total amount of interest calculated at the interest rate over the life of the loan plus prepaid finance charges and the total amount of the mortgage insurance charged over the life of the loan. (Docket No. 148, Exhibit F).

[5] The Fannie Mae Desktop Underwriter is managed and controlled by Fannie Mae. (Docket 147, ¶ 18 (citing to Docket No. 148, Exhibit J)).

[6] Loan-to-value ratio is the ratio between the amount of a mortgage loan and the value of the property pledged as security for the mortgage. Black's Law Dictionary p. 956 (8th ed. 2004).

[7] The loan to value ratio for the Figards was calculated by dividing the amount of the loan sought by the value of the property.

returned them along with copies of their most recent pay stubs and tax information. (Docket No. 148, Exhibit A, R. Figard Dep. 116:20-117:8, June 8, 2007).  Once the pay stubs were provided, PHH recalculated the Figards' estimated monthly income.  David Figard's monthly income was calculated to be $4,040.66 and Rebecca Figard's monthly income was calculated to be $1,244.42 for a combined household monthly income of $5,285.08. (Docket No. 148, Exhibit M).  These numbers were reflected on the "Residential Loan Application" provided to the Figards at their closing on October 27, 2004 which they signed. (Docket No. 148, Exhibit T).

Using the new combined household income figure from the Figard's pay stubs, PHH Mortgage re-performed the Fannie Mae Underwriting Findings on October 26, 2004. (Docket No. 148, Exhibit T; *see also* Docket No. 148, Exhibit O). The new Underwriting Findings found that the Figards qualified for the exact same Expanded Approval Risk Level III loan that they qualified for under the first Underwriting Findings which used the estimates the Figards provided over the telephone. (Docket No. 148, Exhibit O).  And, just like the previous Underwriting Findings, 35% minimum coverage of mortgage insurance was required. (Id.).  The new Underwriting Findings did increase the total monthly payment of the Figards to $765.21 which was a $56.17 increase over the previous estimate.[8] (Id.).

---

[8] This increase in payment was due to an increase in the Hazard Insurance payment from $24.00 to $37.84 and an increase in the taxes from $41.00 to $83.33.  This increase in the monthly payment amount is not a part of any of the Figards' claims.

The Figards closed on their new home on October 27, 2004. (Docket No. 170, Exhibit 3, R. Figard Dep. 141:21-24, June 8, 2007). Present at the closing were Mr. and Mrs. Figard, the closing attorney, Beverely Mears, Esq., the previous owner of the house, Thomas Stout, and a representative from Johnston Realty named Charolette. (Docket No. 170, Exhibit 3, R: Figard Dep. 141:25-142:7). There was no representative of PHH Mortgage present when the Figards closed on their home. (Docket No. 170, ¶ 82). At closing the Figards were provided with the following documents: "Final Truth In Lending Disclosure"; "Initial Escrow Account Disclosure Statement"; a Note; the mortgage paperwork; and a "Residential Loan Application." (Docket No. 147, ¶ 27).

The "Final Truth-In-Lending Disclosure" listed an APR of 11.69756% for the total amount financed of $58,232.95.[9] (Docket 148, Exhibit R). Coupled with the finance charge of $124,570.67, the Figards could expect a total payment of $182,803.62 over the life of the loan. (Id.). In addition, the Final Truth-In-Lending Disclosure informed the Figards of the following:(1) that the loan was fixed; (2) paying off their mortgage loan early would not result in a penalty and may entitle them to a refund of part of the finance charges; (3) they were giving PHH Mortgage a security interest in the property being purchased; and (4) and that someone purchasing their new home would not be able to assume the remainder of the

---

[9] The APR listed in the Final Truth-In-Lending Disclosure is defined in the same terms as it was defined in the Initial Truth-In-Lending Act. *See* fn.3; *see also* (Docket No. 148, Exhibit R).

mortgage on the original terms. (Id.).  Both David and Rebecca Figard signed and

dated this document at the closing. (Id.).

The "Initial Escrow Account Disclosure" gave the Figards an estimate of the

activity they could expect to see in their escrow account during the first year of

their mortgage loan payments.  The estimate was based upon the Figards paying

a monthly mortgage payment of $765.22[10] of which $435.05 would be paid

towards their principal and interest, and the remaining $330.17 would be placed

into an escrow account. (Docket No. 148, Exhibit I).  The Figards signed and dated

this document at the closing. (Id.).

The Figards signed a Note at closing which contained ten covenants along

with an addendum pertaining to the timely payments rewards program. (Docket

No. 148, Exhibit H).  In this agreement, the Figards promised to pay $60,000.00

plus interest at a yearly rate of 7.875% for thirty years.[11] (Docket No. 148, Exhibit

H, ¶¶ 1, 2, and 3).  In addition, the Note provided the Figards with details as to

what the consequences were if the Figards failed to make their loan payments as

required by the Note in the covenant entitled "Borrower's Failure To Pay As

---

[10] The Court notes that the monthly payment in the "Initial Escrow Account Disclosure"
is one penny higher than the monthly payment indicated on the October 26, 2004
Underwriting Findings.  The Court does not know why the monthly payment is higher by one
cent on the "Initial Escrow Account Disclosure Statement."  As the Plaintiffs have not
complained of this difference in monthly payment, the Court will assume that the change in
monthly payment is due to rounding.

[11] The APR is different and often higher than the interest rate agreed to be paid on loans
because the APR includes other costs that may be associated with the loan, and not just the
interest on the loan itself. *See* fn. 3 and fn. 9.

Required." (Docket No. 148, Exhibit H, ¶ 6).  Included in this covenant was a provision which permitted the Note Holder, i.e., PHH Mortgage, to be entitled to the costs and expenses of enforcing the Note, which included reasonable attorney fees. (Docket No. 148, Exhibit H, ¶ 6(e)).

The mortgage instrument granted PHH Mortgage a security interest in the 2321-23 16th Avenue property. (Docket No. 148, Exhibit S).  Under "Uniform Covenants" in the section titled "Payment of Principal, Interest, Escrow Items, Prepayment Charges and Late Charges" the mortgage instrument indicated, *inter alia*, that PHH Mortgage has both the right to retain and reject any payment or partial payment that is insufficient to bring the loan current. (Docket No. 148, Exhibit S, p. 4, ¶ 1).  The retention of any payment, however, would not waive PHH Mortgage's right to reject any future payments or partial payments that would be insufficient to bring the loan current. (Id.).

The Figards had trouble keeping up with their mortgage payment schedule from the very beginning.  The first mortgage payment was due on December 1, 2004. (Docket No. 148, Exhibit H).  The amount due was $765.22 on December 1, 2004, and if not received by December 16, 2004, the amount due was $786.97. (Docket No. 148, Exhibit U).  The Figards did not tender payment to PHH for their December  mortgage payment until December 30, 2004, and they did not make a payment on their mortgage during the entire month of January. (Id.).

On February 3, 2005, the Figards attempted to make a payment of $780.22

but had insufficient funds available in their ARC Federal Credit Union account to cover the payment. (Docket No. 148, Exhibit V).  After making a deposit into their account, the Figards made a successful payment of $780.22 payment on February 4, 2008. (Id.).

ARC Federal Credit Union experienced a computer glitch on February 7, 2005, whereby its records related to the February 4, 2005 transactions were re-created resulting in certain accounts posting the same payments a second time.[12] (Docket No. 148, Exhibit X, Rhoa Dep. 11:13-17; 30:4-19, June 13, 2007).  This meant that due to the computer glitch, ARC Federal Credit Union attempted to send $780.22 to PHH Mortgage on two separate occasions from the Figards' account, once on February 4, and then again on February 7.  The Figards lacked the funds in their account to cover the double posting which would have resulted in PHH receiving an insufficient fund notice on February 7, 2005. (Docket No. 148, Exhibit X, Rhoa Dep. 28:25-29:6, June 13, 2007).

In light of the insufficient fund notice received by PHH Mortgage, the $780.22 which was received by them was "charged back" to the ARC Federal Credit Union, and a letter was sent to the Figards on February 10, 2005, informing them of this action. (Docket No. 148, Exhibit Y and Exhibit Z).  ARC Federal Credit Union has no record of receipt of the funds, and they apparently have no idea what happened to the $780.22 that was "charged back." (Docket No.

---

[12] February 4, 2005 was a Friday, hence February 7, 2005 was the following Monday.

148, Exhibit X, Rhoa Dep. 51:21-52:10, June 13, 2007).[13]

The Figards ignored the February 10, 2005 letter from PHH Mortgage because they were unaware of the computer glitch that occurred on February 7, 2005. (Docket No. 148, Exhibit A, R. Figard Dep. 191:18-192:2, June 8, 2007). As far as they knew, the January payment had been received, and the Figards believed that the letter was merely an error on PHH Mortgage's side as opposed to an error by ARC Federal Credit Union. (Id.).

The next payment that the Figards made toward their mortgage was not until March 10, 2005. (Docket No. 148, Exhibit U).  As they were unaware of the February payment problems, they were under the impression that this payment would have been credited toward their payment due in February. (Docket No. 148, Exhibit A, R. Figard Dep. 220:4-8, June 8, 2007).  In actuality the payment was being credited for their January payment, and as of March 10, the Figards were two months in arrears on their mortgage.

On May 11, 2005, to rectify the problems caused by the computer glitch, the ARC Federal Credit Union took a direct expense and credited the accounts which were adversely affected. (Docket No. 248, Exhibit X, Rhoa Dep. 40:22-41:7, June 13, 2007).  This included depositing $780.22 into the Figards' ARC account which was listed on their transaction list as being a return of the money from the February 4 transaction. (Docket No. 148, Exhibit V).  The Figards reflected their

_____

[13] However, there is no dispute that PHH Mortgage in fact "charged back" the funds to ARC Federal Credit Union. (Docket No. 148, Exhibit Y)

00001661.WPD                    -11-

knowledge of the return of the February 4, 2005 payment by indicating on their payment voucher for the January payment "Return 5/11 bank error made according to MRTG." (Docket No. 148, Exhibit U).

When the April payment for their mortgage was not paid, the Figards were three months in arrears on their mortgage, and an Act 91 Foreclosure Notice was mailed to their home on April 20, 2005. (Docket No. 148, Exhibit BB).  The next payment that the Figards made was for $2,313.61 on May 26, 2005.  (Docket No. 148, Exhibit U).  A payment of $771.05 was equally credited to the Figards' mortgage payments for the months of February, March, and April. (Docket No. 148, Exhibit A, R. Figard Dep. 264:11-24, June 8, 2007).  At this point, the mortgage payment for May remained the only outstanding payment due.

The Figards received letters on June 8, 2005, and on August 8, 2005 notifying them that their mortgage was two months in arrears. (Docket No. 148, Exhibit CC and Exhibit DD).  In response to the June 8, 2005, letter, the Figards tendered a payment of $1,617.50 to cover the amount that was due. (Docket No. 148, Exhibit U).  This payment covered the amounts owed in May and June, but did not cover the July payment.  In response to the August 8, 2005 letter the Figards made a $782.72 payment on September 1, 2005. (Id.).  This payment covered the amount due for July, but August and September remained outstanding.  The Figards next successful payment came on October 1, 2005 when the Figards paid $780.22 which covered the August payment. (Id.).

Payment was tendered to PHH Mortgage next on November 4, 2005 which covered the September payment. (Docket No. 148, Exhibit U).  At this point the Figards were in default for the months of October and November.

On November 23, 2005, the Figards attempted to make a payment to PHH Mortgage to cover the amount owed for the October payment.[14] The Figards failed to make a payment on December 1, 2005, and a second Act 91 Foreclosure Notice was mailed to their house on December 5, 2005. (Docket No. 148, Exhibit GG). PHH Mortgage returned the payment made on November 23, 2005 to the Figards on December 14, 2005 because the amount tendered was insufficient to bring the loan current. (Docket No. 148, Exhibit HH).  The letter notified the Figards that they would need to make a payment of $2,537.05 in order to bring their loan current. (Id.).  The Figards made no further attempts to pay their mortgage after they received this payment back from PHH Mortgage.[15] (Docket No. 148, Exhibit A, R. Figard Dep. 305:24-306:4, June 8, 2007).

Prior to the Figards filing for bankruptcy protection, PHH Mortgage notified the Figards by letter dated March 15, 2006, that an attorney had been retained to begin the foreclosure process. (Docket No. 148, Exhibit II).  At this point

---

[14] The check was apparently dated November 26, 2005, even though the payment was apparently mailed on November 23, 2005. (*See* Docket No. 148, Exhibit U and Exhibit HH).

[15] When asked by Counsel for PHH Mortgage during the June 8, 2007 deposition if there were any further payments made following the return of the November 23, 2005 payment, Rebecca Figard stated: "No, I was done with these people.  I was so done with these people.  Done, had it, over and was willing to do anything to get away from them at this point." (Docket No. 148, Exhibit A, 306:1-4, June 8, 2007).

payments had not been made for six months from October 2005 through March
2006. Subsequent to the letter, the Figards petitioned for bankruptcy relief on
April 25, 2006.

On May 18, 2006, PHH Mortgage filed their proof of claim in the amount of
$65,127.84 (Bankruptcy Case No. 06-70268, Claim No. 1). On May 31, 2006,
counsel for the plaintiffs mailed a letter to PHH Mortgage Company which
purported to be a "Qualified Written Request" under the Real Estate Settlement
Procedures Act, 12 U.S.C. § 2605(e) ("RESPA").[16] (Docket No. 148, Exhibit JJ). The
initial adversary complaint was filed by the plaintiffs/debtors on July 21, 2006.
(Docket No. 1).

The adversary complaint was amended and filed with the Court on March
15, 2007. As amended, the complaint alleges five claims for relief. The Plaintiffs
allege negligence as well as violations of RESPA, the Truth-In-Lending Act, 11
U.S.C. § 506(b) and the Pennsylvania Unfair Trade Practices and Consumer
Protection Law. (Docket No. 79). Defendant PHH Mortgage on August 9, 2007 filed
a motion for summary judgment and a brief in support thereof. (Docket Nos. 144

---

[16] The letter consisted of four pages and contained thirty-seven numbered requests for
information. For example, in numbered request two and nine, the Figards asked for "[a]
complete and itemized statement of all advances or charges against this loan for any purpose
that are not reflected on the loan history transaction statement provided in answer to question
#1;" and for PHH to "[p]lease attach copies of all property inspection reports and
appraisals."(Docket No. 148, Exhibit JJ, Numbered Requests 2 and 9 respectively). Nothing in
this opinion should be construed as indicating that the Court has made a determination that
the letter sent on behalf of the Figards was a Qualified Written Request for RESPA purposes;
and nothing should be construed to indicate that PHH Mortgage violated 12 U.S.C. § 2605(e)
by not responding to the letter. This is a matter that is to be determined at trial if and when
one is scheduled. *See* Part IV of opinion.

and 145).  The Plaintiffs have filed papers opposing the Motion For Summary Judgment.  After having held a hearing on the motion, this matter is now ripe for decision.

## II.

A motion for summary judgment shall be granted if the court determines that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.C.P. 56(c); *see also* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  By its very language the standard is that there has to be no genuine issue of a *material* fact for the Court to determine whether a party is entitled to a judgment as a matter of law. *See* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-8 (1986).  Therefore "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." <u>Id.</u> (emphasis in original).

Only those facts which have the potential to affect the outcome of the pending lawsuit under governing law will be considered material. <u>Id.</u> at 248 (citing to 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2725, pp.93-95 (1983)).

The burden of proof initially lies with the party moving for summary judgment to inform the "court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. at

323.  Once the party moving for summary judgment makes these assertions, the

court will view them in the light most favorable to the non-moving party. <u>Adickes</u>

<u>v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

If a motion for summary judgment is made and supported, the burden shifts

to the non-moving party to point to specific facts indicating that there is a genuine

issue for trial. <u>Jersey Cent. Power & Light Co. v. Lacey Twp.</u>, 772 F.2d 1103, 1109

(3d Cir. 1985); *see also* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248 ("a party

opposing a properly supported motion for summary judgment 'may not rest upon

the mere allegations or denials of his pleading, but . . . must set forth specific

facts showing that there is a genuine issue for trial.'" (quoting <u>First National Bank</u>

<u>of Arizona v. Cities Service Co.</u>, 391 U.S. 253 (1968)).  "[A] genuine issue means

that the evidence must create a fair doubt, and wholly speculative assertions will

not suffice." <u>Jersey Cent. Power & Light Co. v. Lacey Twp.</u>, 772 F.2d at 1109

(citing to <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir.

1985)).  Moreover, if the party opposing the motion for summary judgment has the

burden of proof at trial, that party must produce facts "sufficient to establish the

existence of an element essential to the party's case." <u>Berckeley Inv. Group, Ltd.</u>

<u>v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006) (quoting <u>Celotex Corp. v. Catrett</u>, 477

U.S. at 322).

In a sense, then, the summary judgment phase of a case is the "put up or

shut up" time for the party opposing summary judgment. *See* <u>Berckeley Inv.</u>
<u>Group, Ltd. v. Colkitt</u>, 455 F.3d at 201 (3d Cir. 2006) ("In this respect, summary
judgment is essentially 'put up or shut up' time for the non-moving party . . . .").
It is not the responsibility of the Court to plead a case for a party who is unable
to effectively oppose a properly supported motion for summary judgment.  Indeed,
"[one of the principal purposes of the summary judgment rule is to isolate and
dispose of factually unsupported claims or defenses . . . ." <u>Chelates Corp. v.</u>
<u>Citrate</u>, 477 U.S. 323-4 (referencing Martin B. Louis, <u>Federal Summary Judgment</u>
<u>Doctrine: A Critical Analysis</u>, 83 Yale L.J. 745, 752 (1974); David P. Currie,
<u>Thoughts on Directed Verdicts and Summary Judgments</u>, 45 U.Chi.L.Rev. 72, 79
(1977)).

## III.

At the outset, the Court notes that it is not entirely clear what cause of action the Plaintiffs are alleging in their First Claim For Relief.  The complaint alleges generally that:

> The actions of the Defendant – in failing to properly service the loan and in ultimately forcing Plaintiffs to file this bankruptcy action, and in charging to the account of Plaintiffs fees which have not been approved by the bankruptcy court pursuant to Section 506(b) and Rule 2016, and which were not part of the underlying agreement by and between the holder of the loan and Plaintiffs, in filing [sic] to provide to the Plaintiff [sic] a reliable accounting of the loan, and in failing to respond to Plaintiffs' QWR [*i.e.,* a Qualified Written Request] – constitute a willful or negligent violation of Defendant's duties to Plaintiffs.

(Docket No. 79, ¶ 55).  It is true that there is reference to 11 U.S.C. § 506(b) and Rule 2016 in the First Claim For Relief, but these claims are  addressed in the Plaintiffs' Third Claim For Relief. (Docket No. 79, ¶¶ 61-63).  As to PHH Mortgage's alleged failure to provide a reliable account of the loan, the Court construes this allegation as being a complaint for violation of the Truth-In-Lending Act, 15 U.S.C. § 1601 et. seq., which is addressed in the Plaintiffs' Fourth Claim For Relief. (Docket No. 79, ¶¶ 64-66).  Finally, failing to respond to a Qualified Written Request is handled under Plaintiffs' Second Claim For Relief. (Docket No. 79, ¶¶ 57-60).

Because the Plaintiffs have not offered any explanation as to the relief they are actually seeking in their First Claim For Relief, the Court can only assume

that the First Claim For Relief is negligence cause of action due to the language indicating a "willful or negligent violation of Defendant's duties to Plaintiffs." To the extent that the Plaintiffs' are alleging that PHH Mortgage was negligent in their handling and servicing of the Figards' mortgage, the Court finds that this claim is barred by Pennsylvania's "gist of the action doctrine."[17]

Many courts are hesitant about permitting tort recovery based upon a contractual breach of duty. To maintain the distinction between contractual breaches and tortious breaches, the courts have developed a doctrine known as the "gist of the action doctrine." Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 719 (Pa.Super. 2005) (citing eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa.Super. 2002)). Where tort actions lie for breaches of duties imposed by law as a matter of social policy, contract actions lie only for breaches of duties imposed by consensual agreements between particular individuals. Id. (citing Bash v. Bell Telephone Co. Of Pennsylvania, 601 A.2d 825, 829 (Pa.Super. 1992) (overruled on other grounds)). "In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the

---

[17] The Court notes, as has many other courts prior to this opinion, that the Pennsylvania Supreme Court has not expressly adopted the "gist of the action doctrine." Williams v. Hilton Group, PLC, 261 F.Supp.2d 324, 327 (W.D.Pa. 2003); see also Reardon v. Allegheny College, 926 A.2d 477, 487 (Pa.Super. 2007). However, it is the opinion of this Court, along with various other state and federal courts, that the "gist of the action doctrine is a viable doctrine that will eventually be explicitly adopted by [Pennsylvania's] High Court." Reardon v. Allegheny College, 926 A.2d at 486 n.10 (Pa.Super. 2007) (citing, inter alia, Reed v. Dupuis, 920 A.2d 861 (Pa.Super. 2007); eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa.Super. 2002); Phico Ins. Co. v. Presbyterian Med. Servs. Corp, 663 A.2d 753 (Pa.Super. 1995); Werwinski v. Ford Motor Co., 286 F.3d 661 (3d Cir. 2002); Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001)).

contacts, and not by the larger social policies embodied by the law of torts." Hart
v. Arnold, 884 A.2d 316, 339-40 (Pa.Super. 2005).

The "gist of the action doctrine" will thus prevent a party from raising a tort
claim where the crux of the claim is actually contained in the contract that
governs the relationship of the parties. Sullivan v. Chartwell Inv. Partners, LP, 873
A.2d 710, 718 (Pa.Super. 2005).

Pennsylvania courts have recognized four areas where the "gist of the action
doctrine" will preclude recovery in tort.  Specifically, the "gist of the action
doctrine" will not permit recovery in tort when the claim "(1) arises solely from the
contractual relationship between the parties; (2) when the alleged duties breached
were grounded in the contract itself; (3) where any liability stems from the
contract; and (4) when the tort claim essentially duplicates the breach of contract
claim or where the success of the tort claim is dependent on the success of the
breach of contract claim." Reardon v. Allegheny College, 926 A.2d at 486 (citing
Hart v. Arnold, 884 A.2d at 340 (citing eToll v. Elias/Savion Advertising, Inc., 811
A.2d at 19)).

This is not to say that a party may never recover in tort when the parties
have a contractual relationship.  If the court determines that the contract between
the parties is merely collateral to the tort claim, then the recovery in tort is
permissible. See Hart v. Arnold, 884 A.2d at 339; see also Sun Co., Inc. (R & M)
v. Badger Design & Constructors, Inc., 939 F.Supp. 365, 370 n.5 (E.D.Pa. 1996).

The question to be determined by this Court, then, is whether the "gist of the action" asserted by Plaintiffs in their First Claim For Relief lies in contract or in tort.

On October 27, 2004, the Figards and PHH Mortgage entered into multiple agreements including, but not limited to, the Note and the Mortgage agreement. (Docket No. 148, Exhibits H and S). Both of these agreements establish the duties and obligations of both parties, and specifically, the Mortgage Agreement dictates PHH Mortgage's duties as mortgagee and servicer of the mortgage. Any breach of any duty owed by PHH Mortgage to the Figards would be governed by the Mortgage Agreement.[18]

The Plaintiffs have stated, only in their brief in opposition to PHH Mortgage's motion for summary judgment, that every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing. (Docket No. 150, p. 7 (Brief In Opposition To Defendant's Motion For Summary Judgment, citing <u>Kaplan v. Cablevision of PA, Inc.</u>, 671 A.2d 716 (Pa.Super. 1996) and <u>Somers v. Somers</u>, 613 A.2d 1211 (Pa.Super. 1992)). The use of the word "duty" in discussing a duty of good faith and fair dealing is not the type of duty that is contemplated for tortious negligence. Both of the cases cited to by the Plaintiffs for the proposition that there is a duty of good faith and fair dealing discuss these terms as *contractual*

---

[18] This is not to say that PHH Mortgage does not have other duties under applicable statutory law. If PHH Mortgage did have such duties, those separate claims of the Plaintiffs are not barred by the "gist of the action" doctrine. The other claims are addressed separately in this Memorandum Opinion.

duties and not duties which would give rise to a negligence claim. *See* <u>Kaplan v. Cablevision of PA, Inc.</u>, 671 A.2d at 722 ("we agree with the trial court's determination that Kaplan failed to set forth a viable claim for the breach of the *contractual* duties of good faith and fair dealing" (emphasis added)); *see also* <u>Somers v. Somers</u>, 613 A.2d at 1214 ("[t]herefore, whether under the doctrine of necessary implication, or the Restatement's [Second of Contracts] implied duty of good faith performance of contracts . . . Appellant has stated a claim for breach of *contract*" (emphasis added)).  The Figards have thus failed to establish a duty owed by PHH Mortgage that would give rise to a negligence claim.  This Court therefore concludes that the gist of the action for the Plaintiffs' First Claim For Relief lies in contract law, and thus the "gist of the action doctrine" precludes recovery in tort.

Even assuming *arguendo* that this negligence claim is not barred by the "gist of the action doctrine," the Plaintiffs have failed to establish a *prima facie* case for negligence sufficient to withstand a motion for summary judgment.  In Pennsylvania, as in all states, in order to prove a *prima facie* case for negligence a plaintiff must allege that (1) the defendant had an independent legal duty which was owed to the plaintiff; (2) the defendant breached that duty; (3) such breach was the cause of the purported injury; and (4) the plaintiff actually suffered some sort of loss or damage. <u>Krentz v. Consolidated Rail Corp.</u>, 910 A.2d 20, 27-8 (Pa. 2006) (citing to <u>Phillips v. Cricket Lighters</u>, 841 A.2d 1000, 1008 (Pa. 2003)).

For the sake of argument, if the duties of good faith and fair dealing qualified as independent duties owed to the Figards, the Plaintiffs claim would still fail because they have not pointed to any specific facts which would indicate that PHH Mortgage breached those duties. The Plaintiffs have vaguely stated that PHH Mortgage "failed to properly service the loan," that they have violated 11 U.S.C. § 506(b) in charging unauthorized fees, and violations of both the Truth-In-Lending Act and RESPA.

It can hardly be contended that the alleged actions by PHH would breach the duties of good faith and fair dealing. Good faith has been defined as "honesty in fact in the conduct or transaction concerned" which was adopted from the Pennsylvania Uniform Commercial Code, 13 Pa.C.S.A. § 1201. <u>Southeastern Pennsylvania Transp. Authority v. Holmes</u>, 835 A.2d 851, 858 (Pa.Commw. 2003).

The Figards contend that the duties of good faith and fair dealing were breached due to the method in which the Plaintiffs monthly income was calculated, the number of credit reports that were pulled during the underwriting process, and the manner in which the payments were credited. (Docket No. 79, ¶¶ 18-26, 32-35). The monthly income was calculated using the Figards' actual pay stubs instead of information that was estimated by Rebecca Figard over the phone. The use of actual pay stubs provided a more accurate picture of the Figards' true monthly income, and the Figards have not pointed to any facts that would indicate to this Court that this was not a proper way of calculating a loan

applicant's monthly income.  Other than vaguely stating that an excessive number of credit reports had been pulled which the Plaintiffs believed lowered their FICO score (*i.e.*, credit score), the Plaintiffs have not pointed to any facts that the FICO score was lowered due to any actions of the Defendant.  Finally, as detailed in the facts listed above, with the exception of the ARC computer glitch which caused PHH Mortgage to "charge back" the payment that was sent in, each payment that the Figards made was credited toward the Figards' mortgage payment.  It was not until the November 23, 2005 payment that PHH Mortgage did not credit a payment to the Figards' account.  In returning the payment, the Defendant was exercising their expressed right under the Mortgage Agreement to "return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current." (Docket No. 148, Exhibit S).  This right was clear in the language of the Mortgage Agreement when the Figards signed it on October 27, 2004.  The Plaintiffs have not established that in exercising their right under the contract, the Defendant was not exercising "honesty in fact in the conduct of the transaction concerned."

As the Plaintiffs have not directed the Court to any other legal duty that they were owed by PHH Mortgage, summary judgment in favor of the Defendant as to the Plaintiffs' First Claim For Relief is appropriate.  Simply claiming negligence in a pleading, without more, is insufficient to justify a denial of a properly supported motion for summary judgment.

## IV.

The Second Claim For Relief is based on a violation of 12 U.S.C. § 2605(e)(2) ("RESPA") because the Defendant failed to timely respond to a Qualified Written Request. (Docket No. 79, ¶¶ 57-60). Specifically, the Plaintiffs aver that the letter sent by Figards' counsel to PHH Mortgage was a Qualified Written Request, and in failing to respond to the receipt of it within twenty days, PHH Mortgage violated their statutorily imposed duty to respond. (Id.).

PHH Mortgage contends that the RESPA violation which is the basis for the Plaintiffs' Second Claim For Relief is preempted by the Bankruptcy Code. (Docket No. 145, p. 9). Citing to In re Nosek, 354 B.R. 331 (D. Mass. 2006), PHH Mortgage argues that the Bankruptcy Code's scheme in resolving claim disputes under 11 U.S.C. § 502 overrides RESPA's remedial scheme.

As an initial matter, the Court notes that federal statutes do not preempt other federal statutes. Preemption is based upon the Supremacy Clause of the United States Constitution.[19] Zahl v. Harper, 282 F.3d 204, 210 (3d Cir. 2002). As such, the preemption doctrine comes into play when there are competing federal and state statutes. When there are purported conflicting federal statutes, there is a different analysis which should be done than if there were a purported conflict between a federal and state statute. Britt v. The Grocers Supply Co., Inc.,

---

[19] The Supremacy Clause holds that the laws enacted by the United States government are the supreme law of the land. U.S. Const., Art. VI, cl. 2.

978 F.2d 1441, 1446 (5th Cir. 1992).

The proper analysis should be whether one federal statute implicitly repeals the other. *See* <u>Randolph v. IMBS, Inc.</u>, 368 F.2d 726, 730 (7th Cir. 2004) ("[w]hen two federal statutes address the same subject in different ways, the right question is whether one implicitly repeals the other. . . ."). Repeal by implication is disfavored by our judicial system. There are only two ways in which one federal statute may implicitly repeal the other: when Congress has clearly expressed their intention to do so, or when there is an irreconcilable conflict between the two statutes. <u>Branch v. Smith</u>, 538 U.S. 254, 273 (2003). Otherwise, when two federal statutes are capable of coexistence, it is the duty of the courts to give effect to both statutes if possible. <u>Morton v. Mancari</u>, 471 U.S. 535, 551 (1974); *see also* <u>In re Udell</u>, 454 F.3d 180, 184-5 (3d Cir. 2006) ("[i]t is a well established canon of statutory construction that 'provisions in different statutes should, if possible, be interpreted so as to effectuate both provisions'").

Congress has not clearly expressed its intent to have 11 U.S.C. § 502 act as a substitute for debtors to gather information from their mortgage companies. Indeed, the Supreme Court has emphasized that the only way for Congress to clearly express its intention to have one statute repeal another is when the latter enacted statute encompasses the entire subject area of the previously enacted statute and is "clearly intended as a substitute." *See* <u>Branch v. Smith</u>, 538 U.S. at 273 (quoting <u>Posadas v. National City Bank</u>, 296 U.S. 497, 503 (1936)). That

does not appear to be the case here.  The Bankruptcy Code was enacted in 1978 and RESPA in 1974, but a plain reading of the statutes does not indicate that Congress clearly intended for 11 U.S.C. § 502 to subsume RESPA.  The plain language of RESPA indicates that the statute is to be utilized for information gathering purposes, whereas a plain reading of 11 U.S.C. § 502 indicates that this statute is to be used to object to a claim in bankruptcy.  On their face, the statutes do not appear to be in conflict with one another.  Our inquiry, then, will turn to a juxtaposition of the two statutes and whether there exists an irreconcilable conflict between them.

We begin our analysis with the statutory text of the RESPA statute alleged to have been violated.  Under 12 U.S.C. § 2605(e)(1)(A) "If any servicer of a federally related mortgage loan receives a qualified written request from the borrower . . . for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days . . . unless the action requested is taken within such period."  A Qualified Written Request is defined as "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer that (1) includes, or otherwise enables the servicer to identify the name and account of the borrower; and (2) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the

borrower." 12 U.S.C. § 2605(e)(1)(B).

In contrast, 11 U.S.C. § 502 provides that a proof of claim may be filed and is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a).  If an objection is lodged, "the court, after notice and a hearing, shall determine the amount of such claim . . . ." 11 U.S.C. § 502(b).  The ability to hear and determine matters concerning claim allowance and disallowance is a summary proceeding that is expressly granted to the bankruptcy courts because it is essential to the administration of a bankruptcy estate. Katchen v. Landy, 382 U.S. 323, 329 (1966) (quoting Gardner v. State of New Jersey, 329 U.S. 565, 573 (1947)).  The claims objection process, as outlined in the Bankruptcy Code, provides a quick, efficient, and inexpensive process in which a bankrupt party, having limited assets and multiple claims, can address claims filed against them in one forum. See Katchen v. Landy, 382 U.S. at 329.

The RESPA statute does not address objections to claims and is therefore not in conflict with the 11 U.S.C. § 502, let alone irreconcilable conflict which is a higher standard of conflict.   12 U.S.C. § 2605(e) requires a loan servicer to respond to borrower inquiries. In re Hopkins, 372 B.R. 734, 746 (Bankr. E.D.Pa. 2007).  These inquiries are for "*information* relating to the servicing of such loan." 12 U.S.C. § 2605(e)(1)(A) (emphasis added).  11 U.S.C. § 502 permits a party in interest, including a debtor, to file an objection to a proof of claim when they dispute the amount of said claim.  A debtor may wish to gather information about

the servicing of their mortgage without necessarily wishing to object to a proof of claim.  A debtor may not even know if they should object to a proof of claim unless and until they receive the information from their mortgage company.

Moreover, there must be some evidence present in order to overcome the *prima facie* case established by a proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure.  Simply filing an objection, and then indicating that "we don't have enough information" will not suffice to overcome a properly filed claim.  *See* <u>VFB LLC v. Campbell Soup Co.</u>, 482 F.3d 624 (3d Cir. 2007); *see also* <u>Carter Enterprises, Inc., v. Ashland Specialty Co., Inc.</u>, 257 B.R. 797 (S.D.W.Va. 2001); <u>In re Schwegmann Giant Super Markets</u>, 287 B.R. 649 (E.D.La. 2002); <u>In re McLaughlin</u>, 320 B.R. 661 (Bankr. N.D. Ohio 2005).  In addition, objectors to a properly filed proof of claim, who object without any honest belief or evidence in their pocket may face sanctions under Fed. R. Bankr. P. 9011(c).  It therefore appears that RESPA's informational gathering provisions complement the Bankruptcy Code and Bankruptcy Rules.

Congress expressly stated that the reason for enacting the RESPA provisions was "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs" of real estate settlement. 12 U.S.C. § 2601(a).  This intention, expressed statutorily by Congress, highlights the key distinction between 12 U.S.C. § 2605(e) and 11 U.S.C. § 502.  Namely that the former was enacted to provide consumers with information, whereas the latter

was not.    RESPA rights therefore do not impinge upon the purposes of the

Bankruptcy Code or the Bankruptcy Rules.    RESPA merely provides a statutory

vehicle for the gathering of information that happens to have some teeth to it to

hold companies accountable for not complying with the statute, namely failing to

respond to a Qualified Written Request.    The intent of Congress in enacting the

RESPA provisions should not be frustrated by the application of a different federal

statute.   *See* <u>U.S. v. Palumbo Bros., Inc.</u>, 145 F.3d. 850, 862 (7th Cir. 1998)

("Congressional intent behind one federal statute should not be thwarted by the

application of another federal statute if it is possible to give effect to both laws").

It is true that debtors may obtain the same information that the Figards

sought via RESPA through the Bankruptcy Code and Bankruptcy Rules.   *See* 11

U.S.C. § 502(b); Fed. R. Bankr. P. 3007; Fed. R. Bankr. P. 7001; Fed. R. Bankr.

P. 7026.    After an objection to claim is filed discovery may commence that could

yield the same information that can be obtained through a Qualified Written

Request under RESPA.    This, however, does not mean that the Bankruptcy Code

and Bankruptcy Rules have impliedly repealed RESPA.    To the contrary, this

Court holds that RESPA is alive and well in the bankruptcy context because both

the RESPA statute and the Bankruptcy Code provisions are capable of coexisting

harmoniously with one another.    Just as the Court is not permitted to pick and

choose among the two congressional enactments and must regard each as

effective, so too does PHH Mortgage have to regard each statute as effective.

<u>Morton v. Mancari</u>, 417 U.S. at 552.  The Defendant's motion for summary judgment as to Plaintiff's Second Claim For Relief is therefore denied.

**V.**

In their Third Claim For Relief, the Plaintiffs allege that PHH Mortgage violated 11 U.S.C. § 506(b) because the "fees charged by the Defendant were not part of the underlying agreement by and between the holder of the loan and the debtors, and the fees and costs are otherwise unreasonable and excessive."  As a result, the Figards seek actual damages, punitive damages, and legal fees. (Docket No. 79, ¶¶ 62-63).

11 U.S.C. § 506(b) allows for the holder of an over secured claim to be permitted to claim "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." <u>Id.</u>  The Defendant contends that to the extent that the Plaintiffs are seeking to recover money damages from the alleged violation of 11 U.S.C. § 506(b), the statute must permit a party to raise a private cause of action, but the statute does not.  The Court agrees.

A violation of a federal statute that results in some form of harm or injury to the plaintiff "does not automatically give rise to a private cause of action in favor of that person." <u>Cannon v. University of Chicago</u>, 441 U.S. 677, 688 (1979). Instead, a court must find that Congress intended for such a remedy to be available. *See* <u>Touche Ross & Co. v. Redington</u>, 442 U.S. 560, 568 (1979).

The plain language of 11 U.S.C. § 506(b) does not permit a private cause of

action.  Thus, in order for a party to be able to assert that such a right exists, they

have to look to the court's equitable powers under 11 U.S.C. § 105(a).[20]  But while

Congress intended for 11 U.S.C. § 105(a) to be an instrument with a great deal of

power, it does not give a court the power to create substantive rights which would

otherwise be unavailable under the Bankruptcy Code. In re Morristown & Erie R.

Co., 885 F.2d 98, 100 (3d Cir. 1989).

Recent Third Circuit precedent unequivocally holds that 11 U.S.C. § 105(a)

does not allow for a plaintiff to assert a private cause of action under 11 U.S.C. §

506(b), and the sole remedy for a party alleging a violation of 11 U.S.C. § 506 (b)

is a contempt proceeding. In re Joubert, 411 F.3d 452, 455 (3d Cir. 2005).  In

reaching its decision the Third Circuit analogized 11 U.S.C. § 506(b) to 11 U.S.C.

§ 524(a)(2).  They looked to the overwhelming circuit authority holding that 11

U.S.C. § 105(a) does not give a debtor a private cause of action in a 11 U.S.C. §

524(a)(2) context and found those decisions equally applicable to a complaint

alleging violations of 11 U.S.C. § 506(b).[21] Id. at 456.

Even if in a contempt proceeding under 11 U.S.C. § 506(b), the Plaintiffs

---

[20] 11 U.S.C. § 105(a) states:
> The court may issue any order, process or judgment that is necessary or
> appropriate to carry out the provisions of this title.  No provision of this title
> providing for the raising of an issue by a party in interest shall be construed to
> preclude the court from, *sua sponte*, taking any action or making any
> determination necessary or appropriate to enforce or implement court orders or
> rules, or to prevent an abuse of process.

[21] In general, the consensus of the courts considering whether 11 U.S.C 105(a) creates
a private cause of action under 11 U.S.C. § 524 is that to allow for 11 U.S.C. § 105(a) to create
a private cause of action would be an act of legislating which is not the role of the court. *See*
Pertuso v. Ford Motor Co., 233 F.3d 417, 423 (6th Cir. 2000) and its progeny.

have not "put up" any information to indicate that the proof of claim filed by PHH

Mortgage contained any fees that were not part of the underlying agreement or

that the attorney fees and costs were unreasonable.[22]   In fact, a reading of the

contracts between the two parties expressly provides that attorney fees may be

assessed if actions are taken from the mortgage not being paid on time. (Docket

No. 148, Exhibit H).

In light of this binding precedent and the Plaintiffs failure to produce any

evidence whatsoever that the fees charged by the Defendant are unreasonable,

summary judgment must be granted in favor of PHH Mortgage as to the Figards'

Third Claim For Relief.

## VI.

In their Fourth Claim For Relief, the Plaintiffs allege that PHH Mortgage

violated the Truth-In-Lending Act by providing an inaccurate disclosure of the

APR.   The Plaintiffs contend that they are entitled to "recision of the subject

mortgage, actual damages, punitive damages, costs and attorneys fees." (Docket

No. 79, ¶ 66).

---

[22] The only references to fees and expenses are in the Defendant's proof of claim.  The Figards have not indicated that the fees and expenses are different than what is asserted in the Proof of Claim, and they have not proven that the Defendant is not an oversecured creditor. Nor have the Figards demonstrated that the fees and expenses asserted therein are unreasonable.  In addition, PHH Mortgage has neither amended its proof of claim nor filed a formal application for allowance of additional post-petition fees and expenses.  Without an amendment of its proof of claim or formal application, PHH Mortgage would have no additional claim for fees and expenses. *See e.g.* Still v. Tennessee (In re Rogers), 57 B.R. 170 (Bankr. E.D. Tenn. 1986)(failure to include a post-petition claim in proof of claim deemed a waiver).  To the extent the Figards are somehow objecting to the unclaimed charges of PHH Mortgage, the objection by the Figards is not ripe until such time those unknown charges are actually asserted in these bankruptcy proceedings, if at all.

As to the Figards' right to rescind their mortgage, the plain language of the statute is quite clear.  15 U.S.C. § 1635 gives individuals the right to rescind certain transactions.  15 U.S.C. § 1635(e)(1), however, states that "[t]his section does not apply to a residential mortgage transaction as defined in section 1602(w) of this title." Id.  Looking to the definition of "residential mortgage transaction" the statute is referring to "a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial constructions of such dwelling." 15 U.S.C. § 1602(w).

In the instant action, the Figards obtained a mortgage for the purchase of their residence at 2321-23 16th Avenue, Altoona, Pennsylvania.  They are thus seeking a rescission of a loan which the Truth-In-Lending Act expressly prohibits.  This Court cannot and will not permit a remedy where Congress has expressly stated that no such remedy exists.  Summary judgment is thus appropriate as to the rescission of the mortgage loan.

The Court, however, construes the Fourth Claim For Relief as a complaint for money damages under the Truth-In-Lending Act.  In looking at the merits of the cause of action, the Court recognizes that the Truth-In-Lending Act was established to require full disclosure of credit terms by lenders and to protect the consumer against inaccurate and unfair credit practices. 15 U.S.C. §1601(a).

PHH Mortgage alleges that Plaintiffs' Truth-In-Lending cause of action is time barred. 15 U.S.C. 1640(e) establishes a one-year statute of limitations for actions brought under the Truth-In-Lending Act for money damages. <u>Id.</u>[23]

In their complaint, the Plaintiffs contend that the Defendant committed a Truth-In-Lending Act violation when it allegedly "erred in the Estimated [Truth-In-Lending] Disclosure...and in the Final [Truth-In-Lending] Disclosure." (Docket No. 150, p. 12) (Brief In Opposition To Defendant's Motion For Summary Judgment). It is undisputed that the one year statute of limitations began to run, at the very latest, on October 27, 2004 which was the date of the Final Truth-In-Lending Disclosure statement. (Docket No. 148, Exhibit R). The initial complaint was filed with the Court on July 21, 2006, almost two years after the Final Truth-In-Lending Disclosure statement was provided to the Figards. The Plaintiffs, however, did not allege a violation of the Truth-In-Lending Act until they filed their amended complaint with the court on March 15, 2007, well over two years from the alleged violation. The one year statute of limitations had lapsed before the filing of the original complaint, let alone the filing of the amended complaint. As such, a grant of summary judgment in favor of the Defendant is warranted as the money damages sought by the Plaintiffs Truth-In-Lending cause of action is barred by the applicable statute of limitations.

---

[23] The Truth-In-Lending Act statute of limitations can be equitably tolled if the lender fraudulently concealed information from the consumer until after the statute of limitations has run. *See* <u>Ramadan v. Chase Manhattan Corp.</u>, 156 F.3d 499 (3d Cir. 1998). The Plaintiffs are not alleging, though, that PHH Mortgage concealed information from them until after the statute of limitations has run.

## VII.

In asserting their Fifth Claim For Relief, the Plaintiffs point to the catch-all provision of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Consumer Protection Law"). (Docket No. 79, ¶ 67-70). Specifically, the Plaintiffs allege that the Defendant engaged in fraudulent and deceptive conduct which created a likelihood of confusion or of misunderstanding. (Docket No. 79, ¶ 69) (quoting 73 P.S. § 201-2(4)(xxi)).

There is a split among the lower Pennsylvania Courts as to the proper factual showing that is necessary to sustain a cause of action under the catchall provision of the Consumer Protection Law. The Pennsylvania Superior Court has continuously held that in order for a party to sustain a cause of action under 73 P.S. § 201-2(4)(xxi) they must be able to prove the elements of common law fraud. *See* Sewak v. Lockhart, 699 A.2d 755, 761 (Pa.Super. 1997) ("[f]or a claim to arise under section 201-2(4)(xvii)[24] of the UTPCPL, a plaintiff must prove the elements of common law fraud"); Colaizzi v. Beck, 895 A.2d 36, 39 (Pa.Super. 2006) ("to establish a violation of this catchall provision, 'a plaintiff must prove all of the elements of common-law fraud'").

The Pennsylvania Commonwealth Court, on the other hand, has questioned the Superior Courts insistence upon the continued requisite fraud showing in

---

[24] The 1996 amendments added subsections (4)(xvii) to (4)(xx) and designated former subsection (4)(xvii) as (4)(xxi). These amendments also inserted "or deceptive" preceding "fraudulent". 73 P.S. § 201-2 Historical and Statutory Notes.

light of the 1996 amendments to the statute which added the words "or deceptive" to the language of the statute.  In rejecting the interpretation and requirement of fraud that the Superior Court has continued to hold viable, the Commonwealth Court explained that "(1) the statute is to be liberally construed to effectuate the legislative goal of consumer protection; (2) the legislature's addition of the words 'or deceptive' signals a less restrictive interpretation; and (3) maintaining the pre-1996 requirement would render the words 'or deceptive conduct' redundant and superfluous, contrary to the rules of statutory construction." Com. ex rel. Corbett v. Manson, 903 A.2d 69, 74 (Pa.Commw. 2006).

Federal courts within the Commonwealth, when looking at 73 P.S. § 201-2(4)(xxi) have followed the interpretation of the Commonwealth Court. *See* Mertz v. Donzi Marine, Inc., 2007 WL 710263 (W.D.Pa. 2007); Alberton v. Commonwealth Land Title Ins. Co., 2008 WL 269490 (E.D.Pa. 2008).  This Court too agrees with the sound reasoning of the Commonwealth Court, and will not require a plaintiff to prove the elements of common law fraud to maintain a cause of action under the catchall provision of the Consumer Protection Law.[25]

The question that has to be answered, then, is whether PHH Mortgage engaged in conduct that could be deceptive to the ordinary consumer. Com. ex rel. Corbett v. Manson, 903 A.2d at 74 (citing Commonwealth v. Percudani, 825 A.2d

---

[25] The less restrictive standard to be applied has not been articulated by any court in Pennsylvania, state or federal.  Research has only shown that "a less restrictive" standard should be applied.

at 746).  Throughout the Plaintiffs' amended complaint in the instant adversary proceeding they have made vague allegations, which, if true, could be construed as deceptive to the ordinary consumer.  However, they have failed to substantiate any of these allegations with specific facts.  Without more, quoting the statutory language is insufficient to establish a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.  Simply put, the Figards have not supplied the court with any facts that would be sufficient to deny a grant of a motion for summary judgment.  As a result, a grant of summary judgment in favor of PHH Mortgage is appropriate as to the Plaintiffs' Fifth Claim For Relief.

*(Remainder of Page Intentionally Left Blank)*

## VIII.

For all of the forgoing reasons the Court will enter an order which grants the

Defendant's Motion For Summary Judgment as to the Plaintiffs' First, Third,

Fourth, and Fifth Claims For Relief, and deny summary judgment with respect to

the Second Claim For Relief.  An appropriate order will be entered


Dated this 26th day
of February, 2008                    /s/ Jeffery A. Deller
                                    Jeffery A. Deller
                                    United States Bankruptcy Judge

Case Administrator To Mail:
cc:    Mary K. Wheeler, Esq., Counsel To Plaintiff/Debtor
       John R. Canavan, Esq., Counsel To Defendant
       Ronda J. Winnecour, Esq., Chapter 13 Trustee
       Office of U.S. Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DAVID R. FIGARD, and | ) | Case No. 06-70268-JAD |
| REBECCA J. FIGARD, | ) | |
| | ) | |
| Debtor. | ) | Chapter 13 |
| | ) | |
| _____ | X | |
| | ) | |
| DAVID R. FIGARD, and | ) | |
| REBECCA J. FIGARD, | ) | |
| | ) | Adversary No. 06-07064-JAD |
| Plaintiffs, | ) | |
| | ) | Related To Document Nos. |
| vs. | ) | 144 and 145 |
| | ) | |
| PHH MORTGAGE CORPORATION | ) | |
| F/K/A CENDANT MORTGAGE | ) | |
| CORPORATION, D/B/A COLDWELL | ) | |
| BANKER MO., AND/OR ITS | ) | |
| SUCCESSORS OR ASSIGNS | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | X | |

## <u>ORDER OF COURT</u>

**AND NOW**, this **26<u>th</u>** day of **<u>February</u>**, **<u>2008</u>**, upon consideration of the

Defendant's Motion For Summary Judgment, and with due consideration of the

record made by the parties in these proceedings and for the reasons set forth more

fully in the Memorandum Opinion issued contemporaneously herewith, the Court

hereby **ORDERS, ADJUDGES AND DECREES** that:

    1.    The Motion For Summary Judgment is **GRANTED** in favor of

Defendant as to Plaintiffs' First, Third, Forth, and Fifth Claims

For Relief, and those claims are **HEREBY DISMISSED**;

2. Defendant's Motion For Summary Judgment is **DENIED** as to

Plaintiffs' Second Claim For Relief;

3. A separate trial order will be issued which will establish a time

for trial to determine whether the letter mailed by counsel on

behalf of the Figards was a Qualified Written Request as

contemplated by RESPA and whether the actions or inactions

by PHH Mortgage would subject it to violation of 12 U.S.C. §

2605(e).


February 26, 2008              /s/ Jeffery A. Deller
                               Jeffery A. Deller
                               United States Bankruptcy Judge

CASE ADMINISTRATOR TO MAIL:

cc:    Mary K. Wheeler, Esq., Counsel To Plaintiff/Debtor
       John R. Canavan, Esq., Counsel To Defendant
       Ronda J. Winnecour, Esq., Chapter 13 Trustee
       Office of U.S. Trustee


00001661.WPD                        -2-